Azuzallah SHAHEED–MUHAMMAD,
Plaintiff,

v.

Paul DIPAOLO, et al., Defendants.

No. 99–11842–NG.

United States District Court,
D. Massachusetts.

Sept. 26, 2005.

See also 138 F.Supp.2d 99.

Elizabeth K. Hayes, Department of Correction, Legal Division, Boston, for Officer Leabman Anthony Mendonsa, David Hughes, John H. Marshall, Jr., Omar Rassma, Paul DiPaolo, William Cabino, Defendants.

Joan T. Kennedy, Department of Correction, Boston, for Officer Leabman, Anthony Mendonsa, David Hughes, John H.

Marshall, Jr., Omar Rassma, Paul DiPaolo, William Cabino, All Defendants, Defendants.

Richard C. McFarland, Department of Correction, Boston, for Officer Leabman, Anthony Mendonsa, David Hughes, John H. Marshall, Jr., Omar Rassma, Paul Di-Paolo, William Cabino, Defendants.

Alana A. Prills, for Azuzallah Shaheed–Muhammad, Petitioner.

Laurence H. Reece, III, Reece & Associates, P.C., Boston, for Azuzallah Shaheed–Muhammad, Petitioner.

Douglas W. Salvesen, Yurko & Salvesen, P.C., Boston, for Azuzallah Shaheed–Muhammad, Petitioner.

Azuzallah Shaheed–Muhammad, Arizona State Prison Comples, Florence, AZ, for Azuzallah Shaheed–Muhammad, Petitioner.

Matthew C. Welnicki, Yurko & Salvesen, PC, Boston, for Azuzallah Shaheed–Muhammad, Petitioner.

### MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GERTNER, District Judge.

## I. INTRODUCTION

██ Azuzallah Shaheed–Muhammad brings this action against eight defendants, employees of the Massachusetts Department of Correction ("DOC"). Plaintiff alleges a deprivation of his rights under 42 U.S.C. § 1983 and under Massachusetts constitutional and statutory provisions relating to his incarceration at Massachusetts Correctional Institution, Cedar Junction ("MCI–CJ")[1] and Souza–Baranowski

---

1. Named as defendants from MCI–CJ are John Marshall, former superintendent of MCI–CJ, and William Cabino, correctional officer at MCI–CJ.

Correctional Center ("SBCC").[2] Pending before the Court is defendants' motion for summary judgment [docket entry # 127].

For the reasons stated below, I hereby **GRANT** in part and **DENY** in part the motion for summary judgment.

## II. BACKGROUND [3]

Plaintiff's claims focus on alleged violations of his right to practice his religion as a member of the Nation of Islam. Specifically, plaintiff alleges that between April 29, 1999, and June 23, 1999, defendants at SBCC failed to provide him with vegetarian meals in accordance with his religious practices; denied him access to *The Five Percenter*, a newspaper published by followers of the Nation of Islam; and transferred him to Southeastern Correctional Center ("SECC") in retaliation for asserting his religious freedoms. He also alleges that defendants at MCI–CJ confiscated his religious medallion in 1998.

Plaintiff asserts the following claims in his third amended complaint: violations of 42 U.S.C. § 1983 against all defendants (Count I); violations of Article 46, § 1 of the Massachusetts Constitution against all defendants (Count II); violations of M.G.L. c. 127, § 88 against all defendants (Count III); and violations of M.G.L. c. 12, § 11H–I against Cabino (Count IV).

### A. Plaintiff's Religious Beliefs

Plaintiff asserts that he became a member of the Nation of Islam in August 1994. Adherents to the Nation of Islam share many of the beliefs and practices of traditional Islam, such as the acceptance of the Qur'an, the acceptance of Allah as the only God, the acceptance of Muhammad as Allah's supreme prophet, and the acceptance of the Five Pillars of Islam: declaration of faith, prayer, charity, fasting, and pilgrimage to Mecca. Followers of Elijah Muhammad, however, differ from traditional Muslims in that they believe that Allah came to the United States in 1930 in the person of Wali Fard Muhammad to delegate Elijah Muhammad as his messenger. Plaintiff claims to follow closely the teachings of Elijah Muhammad. In particular, plaintiff states that he adheres to a strict vegetarian diet. Plaintiff alleges that defendants interfered with his ability to prac-

---

**2.** Named as defendants from SBCC are Paul DiPaolo, former superintendent of SBCC; Anthony Mendosa, SBCC Director of Treatment; David Hughes, SBCC Director of Food Services; Omar Bassma, SBCC Muslim Chaplain; Deborah Leabman, SBCC mail officer; and Randy Fisher, Inner Perimeter Security Lieutenant at SBCC.

In this motion for summary judgment, Fisher argues for the first time that plaintiff's claims against him should be dismissed pursuant to Fed.R.Civ.P. 4(c)(1) and 4(m) due to insufficient service of process. Plaintiff counters that Fisher has waived the defense, citing Federal Rule of Civil Procedure 12(h)(1), which provides that "[a] defense of ... insufficiency of service of process is waived ... if it is neither made by motion under this rule nor included in a responsive pleading."

Fisher was not named in the original complaint filed in this case [docket entry # 8]. He was added as a defendant to the second amended complaint filed on March 19, 2003 [docket entry # 88]. Plaintiff concedes that Fisher was not served with the summons and complaint but notes that on May 6, 2003, all defendants named in the second amended complaint—including Fisher—filed a joint amended answer and that the defense of insufficient service was not raised [docket entry # 107]. Because Fisher answered plaintiff's complaint without raising insufficiency of service of process, he has waived the defense. *See Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 42 (1st Cir.2003) (where defendant's answer does not plead insufficiency of process, "the defense is waived"). The motion for summary judgment is therefore **DENIED** on this ground.

**3.** The facts that follow are taken from plaintiff's third amended complaint [docket entry # 100].

tice his Nation of Islam religion in four distinct ways.

## B. Confiscation of Religious Medallion at MCI–CJ

Plaintiff states that on April 18, 1998, he was exiting the dining hall at MCI–CJ when Correctional Officer William Cabino confronted plaintiff and told him to hand over a religious medallion he wore around his neck. The medallion was a plastic crescent moon depicting the Sun, Moon, and Star of Islam. Despite plaintiff's attempt to explain its religious significance, plaintiff was told to turn over the medallion or he would be handcuffed and sent to "the hole," or solitary confinement. Pursuant to Cabino's instructions, plaintiff states that he turned over the medallion.

## C. Denial of Vegetarian Diet at SBCC

On April 29, 1999, while incarcerated at SBCC, plaintiff sent a letter to Omar Bassma, the Muslim chaplain at the prison, requesting a vegetarian diet consistent with his religious beliefs. At the time, plaintiff was being served a pork-free diet that included other meats. On May 6, 1999, Bassma acknowledged receipt of the letter but stated that he could not approve the request. Instead, Bassma told plaintiff that he would refer the matter to Anthony Mendosa, the Director of Treatment at SBCC. Bassma also told plaintiff that Mendosa was unlikely to accommodate him, as a Buddhist prisoner had recently been denied a special diet request.

Plaintiff pursued the matter by writing three additional letters, each of which reiterated his request. The first was sent on May 6, 1999, to Mendosa. The second was sent on May 24, 1999, to Paul DiPaolo, Superintendent of SBCC. The third was sent on June 17, 1999, to David Hughes, SBCC Director of Food Services. Despite his repeated efforts, SBCC officials had not granted his request by the time of his transfer to SECC on June 24, 1999.

## D. Confiscation of The Five Percenter at SBCC

On May 4, 1999, plaintiff placed an order for two newspaper issues published by the Allah Youth Center in Mecca ("AYCIM") in New York City, an organization funded by the Nation of Islam. Upon approval by the SBCC Unit Manager on May 5, 1999, costs were withdrawn from plaintiff's prison account to pay for the publications.

On May 25, 1999, Deborah Leabman, the SBCC mailroom officer, received one of the newspapers requested by plaintiff and determined that it should be reviewed by Inner Perimeter Security ("IPS"). Randy Fisher, the lieutenant in charge of the IPS team at SBCC, informed Leabman that the newspaper was contraband. That same day, plaintiff received a "Notice of Non–Delivery of Mail" form, signed by Deborah Leabman. The notice stated that IPS had determined that the newspaper was contraband and designated it for return to the AYCIM on May 26, 1999.

On May 25, 1999, plaintiff sent a letter to DiPaolo appealing the decision not to deliver the newspaper to him. Plaintiff was never informed of the appeal's outcome, nor did he receive the newspaper. Plaintiff also notes that he never received the second newspaper he ordered.

## E. Transfer from SBCC

On June 24, 1999, plaintiff was transferred from SBCC (a level six facility) to SECC (a level four facility). Plaintiff alleges that the transfer was in retaliation for his attempts to exercise his religious rights. After being transferred to SECC, plaintiff was transferred to a state prison in Arizona. Plaintiff's transfer out of state is not part of the instant complaint.

### F. *Procedural History*

In a previous Memorandum and Order issued on March 19, 2001, this Court granted defendants' motion for judgment on the pleadings as to plaintiff's claims for injunctive relief under 42 U.S.C. § 1983 because plaintiff's transfer to a correctional facility outside the jurisdiction of Massachusetts rendered his claim for injunctive relief moot [docket entry # 23]. *See Shaheed–Muhammad v. Dipaolo*, 138 F.Supp.2d 99 (D.Mass.2001). At the same time, defendants' motion to dismiss in its entirety was denied in a Memorandum and Order dated March 20, 2002 [docket entry # 37].

### G. *Summary of the Arguments*

Defendants argue that they are entitled to summary judgment on all of plaintiff's claims. They begin by arguing that plaintiff's religious beliefs are insincere and thus not entitled to protection under the First Amendment; accordingly, they argue that none of his claims should proceed to trial. Next, they address each of plaintiff's claims individually. Defendants argue for summary judgment on plaintiff's claims regarding the alleged confiscation of his religious medallion at MCI–CJ on the grounds that plaintiff failed to exhaust his administrative remedies as to his federal claim, as required by the Prison Litigation Reform Act ("PLRA"); that plaintiff has failed to state a claim under the Massachusetts Civil Rights Act; and that Cabino is entitled to qualified immunity. As to plaintiff's claims regarding the denial of his requests for a vegetarian diet at SBCC, defendants argue that plaintiff failed to exhaust his federal claim; that the denial was reasonably related to legitimate penological concerns under both federal and state law; and that all defendants are entitled to qualified immunity. As to plaintiff's claims regarding the confiscation of

*The Five Percenter* at SBCC, defendants argue that plaintiff failed to exhaust his federal claim under the PLRA; that the confiscation was reasonably related to legitimate penological concerns under federal and state law; that no facts alleged by plaintiff link Bassma, Mendosa, and Hughes to the confiscation; and that all defendants are entitled to qualified immunity. As to plaintiff's claims regarding his transfer from SBCC, defendants assert that plaintiff has not alleged facts sufficient to meet the legal standard for retaliatory transfer. Finally, defendants argue that the PLRA prevents plaintiff from seeking compensatory damages on his federal claims.

Plaintiff contests all of defendants' arguments, save his concession that he failed to exhaust his administrative remedies relating to his federal medallion confiscation claim. Because plaintiff has conceded his failure to exhaust his federal medallion confiscation claim, I GRANT the motion for summary judgment in that respect. In addition, I agree with defendants that plaintiff has failed to allege facts sufficient to meet the legal standard for retaliatory transfer, and that plaintiff has failed to link Bassma, Mendosa, and Hughes to *The Five Percenter* confiscation. Accordingly, I **GRANT** their motion in those respects. On all other grounds, I **DENY** the motion for summary judgment.

## III. *ANALYSIS*

### A. *Standard of Review*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue is

defined as one for which "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citation omitted). A fact is "material" if it "has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the non-movant." *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 428 (1st Cir.1996).

Once the moving party demonstrates the " 'absence of evidence to support the non-moving party's case,' the burden of production shifts to the nonmovant." *Dow v. United Brotherhood of Carpenters*, 1 F.3d 56, 58 (1st Cir.1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-movant must then "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). The court must:

> 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.' If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

*Id.* (citations omitted).

## B. *Defendants Are Not Entitled to Summary Judgment on the Ground that Plaintiff's Religious Beliefs Are Insincere*

■ It is well established that prisoners do not forfeit all constitutional protections simply by virtue of their incarceration. *See Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Supreme Court has specifically held that inmates retain First Amendment protections, *see Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), including the free exercise of religion, *see Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam).

■ As a threshold matter, however, defendants argue that they are entitled to summary judgment because plaintiff's religious beliefs are not sincerely held and therefore not entitled to protection under the First Amendment. *See, e.g., Brown-El v. Harris*, 26 F.3d 68, 69 (8th Cir.1994) ("In a claim arising under the First Amendment's free exercise clause, an inmate must first establish that a challenged policy restricts the inmate's free exercise of a *sincerely held* religious belief.") (emphasis added). Defendants ask me to evaluate the sincerity of plaintiff's beliefs—a difficult enough task, made more difficult by the fact that it is being undertaken on a motion for summary judgment. I question any court's ability to determine the sincerity of a plaintiff's beliefs on a cold record. Moreover, as the Supreme Court has noted in the context of addressing religious exemptions from military service, "the threshold question of sincerity" is a "question of fact." *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). In light of this standard, I find defendants' evidence of insincerity unpersuasive.

Defendants point to three factors that they believe indicate the insincerity of plaintiff's beliefs. First, they argue that a long history of pro se litigation by an inmate against prison officials should raise doubts about the legitimacy of a plaintiff's suit. In *Thacker v. Dixon*, 784 F.Supp. 286, 295–96 (E.D.N.C.1991), the district court noted that plaintiff's seventeen suits

against prison officials raised questions as to whether the current lawsuit was simply part of a pattern of harassing litigation. In this case, defendants state that plaintiff filed seven civil actions during his seven and a half years in Massachusetts prisons[4] and argue that "an inference can be drawn ... that he files litigation for pecuniary gain." Def. Mem. at 13. This factor, however, cannot be definitive; plaintiff could certainly be both litigious and observant.

Second, defendants urge the Court to consider evidence of nonobservance of tenets of plaintiff's religion, which they refer to as backsliding. They assert that such evidence "is relevant on the question of sincerity, and is especially important in the prison setting, for an inmate may adopt a religion merely to harass the prison staff with demands to accommodate his new faith." *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir.1988) (citation omitted). Defendants note that on December 22, 1998, plaintiff wrote to DiPaolo requesting a pork-free diet, rather than the vegetarian diet he later claimed was mandated by his religious beliefs. Pl. Exh. 7. Indeed, plaintiff requested that "when turkey [-]ham or bologna slices are being served I be given a substitute meal such as peanut butter and jelly, tuna fish, egg salad or *chicken salad, turkey slices*, etc. to make sandwiches." *Id.* (emphasis added). In addition, defendants state that plaintiff has not attempted to order *The Five Percenter* since his two copies were confiscated at SBCC.

Both of defendants' arguments about nonobservance prove too much. Plaintiff sought to ensure he was served a pork-free diet in December of 1998. Four months later he sought a vegetarian diet. These requests would be inconsistent if plaintiff had requested the chicken and turkey substitutes after he requested a

vegetarian diet. In the order presented here, however, they could suggest an evolution of beliefs, for which plaintiff should not be punished. I find defendants' assertion that plaintiff has not attempted to order *The Five Percenter* equally unavailing. Why would plaintiff place additional orders, given that he had every reason to believe they would be confiscated? Moreover, even if defendants could demonstrate backsliding, I would not consider it definitive evidence of insincerity. The reasoning of the Seventh Circuit is instructive:

> [T]he fact that a person does not adhere steadfastly to every tenet of his faith does not mark him as insincere. Some religions place unrealistic demands on their adherents; others cater especially to the weak of will. It would be bizarre for prisons to undertake in effect to promote strict orthodoxy, by forfeiting the religious rights of any inmate observed backsliding, thus placing guards and fellow inmates in the role of religious police.

*Reed*, 842 F.2d at 963. The court goes on to assert that it would be "improper" to consider backsliding "conclusive evidence of insincerity." *Id.*

Third, defendants point to the length of plaintiff's adherence to his faith. Defendants note that when plaintiff was admitted into the Massachusetts prison system on June 4, 1992, he listed his religion as Christian. Def. Exh. 8. They cite to *Robinson v. Foti*, 527 F.Supp. 1111, 1113 (E.D.La.1981), where the court found that plaintiff's religious beliefs were not sincerely held and noted that plaintiff self-identified as a Baptist a mere year before claiming to be a Rastafari. In this case, however, plaintiff self-identified as a Christian six years before any of the incidents alleged in the complaint, and his conten-

---

4. They do not, however, provide any documentary support for this contention.

tion that he has been a member of the Nation of Islam since August 1994 is uncontroverted.

Fourth, defendants argue that plaintiff is unfamiliar with the general tenets of the Five Percenter sect and has studied other religions during his imprisonment. Def. Exh. 4, p. 30–31, 159–60. The portions of plaintiff's deposition to which defendants point, however, do not support this position. Though plaintiff initially stated he did not know whether a Five Percenter is a religion or a gang, he later identified it as an offshoot of the Nation of Islam. Def. Exh. 4, p. 30–31. And while plaintiff admitted to ordering a book on the Rosicrucian faith, he emphatically denied practicing that faith. Def. Exh. 4, p. 160. Plaintiff should not be punished for mere curiosity about other religions.

Defendants conclude by arguing that plaintiff has been provided with sufficient alternatives for practicing his religion. This argument, however, does not speak to the sincerity of plaintiff's beliefs and will therefore not be addressed here.

As I noted above, I question the Court's ability to determine the sincerity of plaintiff's beliefs on a cold record at the summary judgment stage. *See Seeger*, 380 U.S. at 185, 85 S.Ct. 850. Indeed, other courts have noted that in determining the sincerity of an inmate's beliefs, "observ[ing] plaintiff's demeanor and hear[ing] his answers to questions" was particularly instructive. *Thacker*, 784 F.Supp. at 296. In any event, on this record, I reject defendants' position. Accordingly, I **DENY** defendants' motion on this ground.

### C. *Claims Related to the Medallion Confiscation at MCI–CJ*

#### 1. *Plaintiff's § 1983 Claim Is Barred by the PLRA*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The term "prison conditions" refers to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Supreme Court has further held that "[a]ll 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective' .... Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Id.* at 524, 122 S.Ct. 983. Thus, there is no futility exception to the PLRA.[5] Because the PLRA was in effect when plaintiff filed his complaint in this case in August 1999, failure to exhaust his administrative remedies would be fatal to his federal claim.[6]

---

**5.** Defendants also contend that the strictures of the PLRA apply to plaintiff's state law claims, arguing that the failure to exhaust administrative remedies under § 1997e(a) requires that the entire claim be dismissed. Defendants provide no citations to case law to support this argument, instead pointing to the language of the PLRA itself: "no *action* shall be brought ...." (emphasis added). Defendants' argument as to the statute's plain language, however, is disingenuous, as the statute reads that "[n]o action shall be brought with respect to prison conditions *under section 1983 of this title, or any other Federal law* ...." (emphasis added).

**6.** The PLRA went into effect on April 26, 1996. *See Wright v. Morris*, 111 F.3d 414, 417 (6th Cir.1997).

■ Defendants assert that the inmate grievance records at MCI–CJ indicate that plaintiff did not file a grievance regarding the alleged confiscation of his religious medallion. *See* Affidavit of Patrick Barrett, Acting IGC, Def. Exh. 1. At the hearing on defendants' motion on May 3, 2005, plaintiff conceded that he failed to grieve the confiscation of his religious medallion and that his § 1983 claim regarding the confiscation of his religious medallion is barred by the PLRA. Accordingly, the motion for summary judgment is hereby **GRANTED** on this ground.

### 2. *Plaintiff Has Stated a Claim under the Massachusetts Civil Rights Act* [7]

Plaintiff claims that Officer Cabino [8] violated his rights under M.G.L. c. 12, § 11H–I of the Massachusetts Civil Rights Act ("the Act") by confiscating his religious medallion. Cabino counters that plaintiff has failed to state a claim upon which relief can be granted.

■ In order to establish a claim under the Act, plaintiff must prove that: (1) his exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference ... was by threats, intimidation or coercion. *Columbus v. Biggio,* 76 F.Supp.2d 43, 54 (D.Mass. 1999) (citation omitted). For the purposes of the Act, the Supreme Judicial Court has defined a "threat" as "involv[ing] intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake,* 417 Mass. 467, 474, 631 N.E.2d 985 (1994).

■ Cabino advanced his failure to state a claim argument in an earlier motion to dismiss, which I rejected in my March 20, 2002, opinion. I concluded that plaintiff had alleged a constitutionally protected right to religious free exercise by wearing a medallion.[9] And accepting plaintiff's allegation that Cabino threatened to send him to "the hole"—which is required in ruling on both a motion to dismiss and a motion for summary judgment, *see National Amusements,* 43 F.3d at 735—I also found that plaintiff was threatened. My reasoning remains sound, and Cabino has advanced no new arguments here. Accordingly, I hereby **DENY** the motion for summary judgment on this

---

7. Defendants argue that they are entitled to summary judgment on all of plaintiff's state law claims because they are governed by DOC regulations that do not create a private right of action. *See* 103 C.M.R. § 403.00 *et seq.* ("Inmate Property"); 103 C.M.R. § 471.00 *et seq.* ("Inmate Religious Programs and Services"); 103 C.M.R. § 481.00 *et seq.* ("Inmate Mail"). *See also Loffredo v. Center for Addictive Behaviors,* 426 Mass. 541, 545–46, 689 N.E.2d 799 (1998) (no private cause of action under regulation in absence of clear legislative intent).

Plaintiff, however, has not alleged violations of any of these regulations. Rather, his state law claims are made directly under the state constitution and statutes. The fact that regulations are also germane to his allega-

tions is irrelevant. Accordingly, I hereby **DENY** the motion for summary judgment on this ground.

8. Plaintiff names only Officer Cabino in Count IV of his complaint.

9. *See also* 103 C.M.R. § 410.10(6)(c):

[A]n inmate may possess a maximum of one religious medal to be worn on a chain. The medal shall not exceed a thickness of 1/8″ and a diameter of 1½″. No chain shall be longer than 20″ in length and shall not exceed 1/8″ in diameter. No hollow type, locket type, or gem stone medals allowed. The religious medal and chain must be purchased as a set.

ground.[10]

### 3. *Cabino Is Not Entitled to Qualified Immunity*

■ Cabino also argues that he is entitled to summary judgement on plaintiff's claim under the Massachusetts Civil Rights Act because the doctrine of qualified immunity shields him from liability. Massachusetts has adopted the standard of qualified immunity for public officials under § 1983 and applied it to suits brought under the Civil Rights Act. *Duarte v. Healy*, 405 Mass. 43, 46, 537 N.E.2d 1230 (1989).

■ The First Circuit has formulated a three-step test for determining the validity of qualified immunity claims:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

*Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 141 (1st Cir.2001) (citations omitted). *See also Caron v. Silvia*, 32 Mass.App.Ct. 271, 273, 588 N.E.2d 711 (1992) (to defeat defense of qualified immunity under the Civil Rights Act, plaintiff was "obliged to show that the defendants deprived her of a 'clearly established' right, that is, one, not in the abstract but based on particular circumstances, of which a reasonable person would have been aware at the time").

■ Cabino argues that he is entitled to qualified immunity because plaintiff can prove neither the deprivation nor even the existence of a clearly established right.[11] First, Cabino argues that there is no showing that he violated plaintiff's rights under the Act. Specifically, Cabino argues that plaintiff has not alleged that he was subjected to "threats, intimidation or coercion." *Columbus v. Biggio*, 76 F.Supp.2d 43, 54 (D.Mass. 1999). As noted above, however, plaintiff asserts that Cabino threatened to send him to "the hole" if he refused to turn over his medallion. The prospect of being sent to solitary confinement is certainly sufficient to constitute a threat.

Second, Cabino argues that in April 1999 there was no clearly established right to wear a religious medallion under Massachusetts law. Plaintiff's argument is disingenuous at best. The Code of Massachusetts Regulations specifically states that "an inmate may possess a maximum of one religious medal to be worn on a chain." 103 C.M.R. § 403.1096(c). Moreover, Cabino himself acknowledged at deposition that inmates were allowed to wear religious medallions, though they were required to tuck them into their shirts. Def. Exh. 28, p. 36. Accordingly, I find that Cabino is not entitled to qualified immunity and hereby **DENY** the motion for summary judgment on this ground.

### D. *Claims Related to the Denial of a Vegetarian Diet at SBCC*

### 1. *Plaintiff's § 1983 Claim Is Not Barred by the PLRA*

As noted above, the PLRA requires prisoners challenging prison conditions to

---

10. Defendants have not argued that they are entitled to summary judgment on plaintiff's claims under the Massachusetts constitution and M.G.L. c. 127, § 88 regarding the confiscation of his religious medallion. Accordingly, those claims survive.

11. Defendants argue that all defendants are entitled to qualified immunity under the Act. Because Cabino is the sole defendant named in Count IV of the complaint, however, only his arguments will be addressed here.

exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). The administrative remedies available to inmates are detailed in the Code of Massachusetts Regulations and inmate orientation booklets provided to prisoners when they enter SBCC. As with plaintiff's medallion confiscation claim, defendants assert that the inmate grievance records at SBCC indicate that plaintiff did not file a grievance regarding the denial of his request for a vegetarian diet. Here, however, plaintiff argues that he did, in fact, grieve the denial of his request. Defendants respond that plaintiff failed to follow the appropriate formalities and that the letters he submitted to SBCC personnel cannot be considered grievances. As explained below, I disagree.

### a. *SBCC Grievance Process*

The SBCC inmate handbook, which is attached to plaintiff's opposition as Exhibit I, states that a prisoner is "encouraged" to go through an "informal" process whereby he notifies the "staff who are responsible in the particular area of the problem" either orally or in writing. The grievance procedure requires that the staff respond to the prisoners' complaint: "An informal grievance or Inmate to Staff Request Form must be completed by the inmate and responded to by the appropriate staff." [12]

If the complaint cannot be resolved informally, it proceeds as a formal grievance. The handbooks state that the inmate "should obtain a copy of the Inmate Grievance Form" and remit the completed form

to a Unit Team member. If the grievance cannot be resolved at the Unit Team level, it will be forwarded to the Institutional Grievance Coordinator ("IGC") [13] to investigate. Following an investigation, the inmate is to be notified of the IGC's findings. The inmate may then appeal the decision using the Inmate Grievance Appeal Form.

More detailed specifications regarding the grievance process are contained in the Code of Massachusetts Regulations. *See* 103 C.M.R. § 491.00 *et seq.* Those regulations define a "grievance" as "a written complaint filed by an inmate on the inmate's own behalf in accordance with 103 C.M.R. § 491.00." 103 C.M.R. § 491.06. Classification and disciplinary decisions are not grievable. 103 C.M.R. § 491.08(1). The prisoner is required to file a grievance "within ten working days of the actual incident or situation or within ten working days of the inmate's becoming aware of the incident or situation." 103 C.M.R. § 491.08(4). Prisoners "may" process their grievances by obtaining an institution grievance form from locations and staff persons designated by the Superintendent. 103 C.M.R. § 491.09(1). All grievances are to contain the date of the incident, the name of the inmate's current institution, the name of the institution of complaint, a brief statement of the facts, the remedy requested, and the signature of the prisoner and staff recipient. 103 C.M.R. § 491.09(2).

The grievance is to be forwarded to the IGC. 103 C.M.R. § 491.09(3)(C). Upon receipt, the IGC is to notify the prisoner that

---

12. The requirement that the prisoner complete an informal grievance or complete an Inmate to Staff Request Form prior to filing a formal grievance seems to conflict with 103 CMR 491.07: "While inmates are encouraged to pursue informal measures prior to filing a grievance, they shall not be required to do so."

13. According to the handbook, the IGC "has been delegated the authority to receive, review, and investigate any grievances of an institutional nature and to grant and implement relief as approved by the Superintendent" of the prison.

the grievance has been received and ensure that the grievance complies with the regulations. 103 C.M.R. § 491.01(1). If the grievance does not comply, the IGC is to return the grievance to the prisoner with a written explanation as to why the grievance does not comply. 103 C.M.R. § 491.10(1)(B). The IGC then interviews the prisoner and, if appropriate, the staff person responsible for the area where the problem occurred. 103 C.M.R. § 491.10(1)(C). Within ten days of receiving the grievance, the IGC is to propose a resolution or deny the grievance, and provide the prisoner with a written explanation. 103 C.M.R. § 491.10(1)(E)-(F).

Defendants contend that the inmate grievance records at SBCC indicate that plaintiff did not file a grievance regarding the denial of his request for a vegetarian diet. *See* Affidavit of Maria Sazonick, Def. Exh. 3. Defendants note that plaintiff was clearly aware of the grievance process, as he filed three grievances from November 1998 to June 24, 1999. Defendants also point to plaintiff's own interrogatory answers, in which he stated that he did not file an inmate grievance regarding the denial of a vegetarian diet. *See* Plaintiff's Responses to Defendant's Interrogatories, # 19, Def. Exh. 2.

Plaintiff's response is two-fold. First, plaintiff asserts that the grievance procedures discussed above were not in place at SBCC when the incidents occurred. The SBCC booklet did not become effective until September 23, 1999. The regulations governing inmate grievances, moreover, were not promulgated until 2001. *See* Pl. Exh. M. Plaintiff's argument regarding the SBCC grievance procedure is severely undercut, however, by the fact that plaintiff filed three grievances concerning missing property at that institution between November 1998 and June 24, 1999. Plaintiff argues that there is no evidence that he

was aware that the same procedure could be used to grieve "broader issues regarding his religious practices," but neither is there evidence that plaintiff was led to believe that the same procedure could not be used. Pl. Mem. at 10. Given that plaintiff utilized the grievance process on three separate occasions while incarcerated at SBCC, I find plaintiff's argument unavailing.

**b. *Plaintiff's Grievances***

■ Plaintiff's second argument, however, is more compelling. He contends that he did in fact grieve the denial of a vegetarian diet. On April 29, 1999, plaintiff wrote to Omar Bassma, a Muslim chaplain at SBCC, requesting a vegetarian diet. Pl. Exh. A. After he received the letter, Bassma consulted with Director of Treatment Anthony Mendosa and head chaplain Abraham Rahim. Bassma Dep., Pl. Exh. G. Although Rahim advised Bassma that the issue should be addressed to a religious committee that reviews these types of requests, Bassma never followed up with Rahim or consulted David Hughes, Director of Food Services. *Id.*

On May 6, 1999, having received no response from Bassma, plaintiff wrote to Mendosa directly. Pl. Exh. B. Again, plaintiff argues that his letter meets the relevant requirements for a grievance. On May 23, 1999, still having heard nothing from Bassma or Mendosa, plaintiff wrote to Superintendent Paul DiPaolo. Pl. Exh. C. Superintendent DiPaolo referred plaintiff's letter to Mendosa in a memorandum dated May 26, 1999, and asked him to "[p]lease reply to the sender that the Superintendent has referred this matter to you." Pl. Exh. D. Plaintiff never received a response to any of his letters. DiPaolo Dep., Pl. Exh. H.

Plaintiff argues that each of the letters described above constitutes a "grievance"

under the Code of Massachusetts Regulations and the SBCC booklet. Each is a written statement containing all information required by 103 C.M.R. § 491.09(2) and is addressed to an appropriate staff member. It is immaterial that they are not printed on the inmate grievance form, as the Regulations provide that a prisoner "may" use the form and the SBCC booklet states that the prisoner "should" use the form. Moreover, if defendants believed that plaintiff's grievances were filed in an improper format or failed to comply in some other way, they were obligated to return the grievances to him, 103 C.M.R. § 491.10(1)(B); provide him with a written explanation of the deficiencies, 103 C.M.R. § 491.10(1)(B); and permit him an additional three working days to file the grievance in the proper format, 103 C.M.R. § 491.08(4).

I agree with plaintiff that these letters satisfy the relevant requirements and are in fact grievances. Moreover, defendants themselves violated the grievance procedure contained in the SBCC booklet by failing to respond to his letters. *See, e.g., Pritchett v. Page,* 2002 WL 1838150 (N.D.Ill.2002) (administrative remedies are not "available" where plaintiff received no response to grievances and thus could not file an administrative appeal); *Polite v. Barbarin,* 1998 WL 146687, at *2 (S.D.N.Y.1998) (noting that defendants' failure to respond to plaintiff's grievances cast doubt on defendants' claim that plaintiff failed to exhaust his administrative remedies). Having failed to abide by the strictures of their own regulations, defendants should not be allowed to claim plaintiff's noncompliance as a bar. I therefore **DENY** defendants' motion for summary judgment on the ground of non-exhaustion of administrative remedies with regard to plaintiff's request for a vegetarian diet.

### 2. *Defendants Are Not Entitled to Summary Judgment on the Ground that the Denial of a Vegetarian Diet Was Reasonably Related to Legitimate Penological Concerns*

Plaintiff alleges that the pork-free diet made available to him at SBCC from April through June 1999 did not conform to the dietary restrictions imposed by the Nation of Islam, thereby violating his rights under the Free Exercise Clause of the First Amendment. Defendants argue that they are entitled to summary judgment on plaintiff's resulting § 1983 claim because any restrictions placed on plaintiff's diet were reasonably related to legitimate penological concerns.

As noted above, prison inmates retain the right to free exercise under the First Amendment. *Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. 1079. Prisoners do not, however, enjoy the same level of constitutional protections as do other citizens. *See, e.g., Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Accordingly, "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Thus, even "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

Four factors are to be considered in determining whether a regulation is reasonably related to a legitimate penological

interest. First, there must be a valid, rational connection between the regulation and the legitimate governmental interest set forth to justify it. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Second, the court must consider whether the inmate retains alternative means through which to exercise the right. *Id.* at 90, 107 S.Ct. 2254. The First Circuit has clarified that this prong is an inquiry into "whether an inmate has alternative means of expressing his religious beliefs generally, not whether there is an alternative means of engaging in the particular religious practice in issue." *Denson v. Marshall*, 230 F.3d 1347, 1347 n. 1 (1st Cir.2000). Third, the court must examine the impact of the requested accommodation on prison guards, other inmates, and the allocation of prison resources. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. Fourth, the court must ascertain whether there are "ready alternatives" available to the regulation. *Id.* The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* At least one circuit has held that "[n]either *Turner* nor *O'Lone*, however, *require* a court to weigh evenly, or even consider, each of these factors." *Scott v. Miss. Dep't of Corrections*, 961 F.2d 77, 80 (5th Cir.1992) (emphasis in original).

■■■ Defendants argue that the first factor is satisfied in that a valid, rational connection exists between the denial of plaintiff's request for vegetarian meals and legitimate governmental interests. First, defendants note that prisons have a legitimate interest in operating an efficient and cost-effective food program. *See Denson v. Marshall*, 59 F.Supp.2d 156, 158 (D.Mass.1999). And during the period covered by plaintiff's complaint, vegetarian diets were not available to any inmates in the Commonwealth. *See* Def. Exh. 22.

According to the affidavit of Christopher Gendreau, Acting Director of DOC Food Services, preparation of customized meals for individual inmates is prohibitively expensive and administratively difficult. *See* Def. Exh. 17, ¶ 9.

Second, defendants argue that the denial of plaintiff's request was valid and rational because SBCC employees concluded that plaintiff's religious needs could be met by a pork-free diet. Specifically, defendants assert that Muslim Chaplain Omar Bassma informed SBCC Food Services Director David Hughes that a vegetarian diet was not required for Muslims and that a pork-free diet was sufficient. Hughes Dep., Def. Exh. 15, p. 31–32. In addition, defendants note that plaintiff's letter to DiPaolo requesting a vegetarian diet cited to Elijah Muhammad's book *How to Eat to Live* as evidence that a vegetarian diet was mandated. Defendants assert that the book requires merely a pork-free diet. *See* Def. Exh. 18, p. 60–62. Indeed, on page 61, Elijah Muhammad directs that "[i]t is not a sin for you to eat meat, but it is a sin for you to eat the meat of the hog." Defendants ignore the following sentence, however, which reads that "it is best that we do not eat meat." *Id.*

Defendants argue that the second factor is satisfied because plaintiff had adequate alternative means of practicing his religion. Specifically, defendants note that plaintiff was served a pork-free diet, permitted to possess religious books, attend weekly religious services, meet with a religious leader, pray five times daily, use prayer beads, wear a kufi, and use prayer oil. Additionally, plaintiff participated in the Ramadan fast and two Eid feasts at which Halal meat was served. *See* Mendosa Aff., Def. Exh. 9, ¶ 14–15. In *Denson v. Marshall*, the district court found that the prison had not violated plaintiff's constitutional rights by denying his request for

after-hours food service to accommodate his fast during daylight hours. 59 F.Supp.2d at 157–58. The court relied in part on its conclusion that the same accommodations cited by defendants in this case provided Denson with adequate alternative means of practicing his religion. *Id.* at 159.

Defendants argue the third factor is satisfied because the requested accommodation would negatively impact prison guards, other inmates, and the allocation of prison resources. As noted above, defendants contend that granting plaintiff's request would have created logistical problems and been quite expensive. In addition, defendants note that only a month before, a Buddhist inmate's request for a vegetarian diet was denied, *see* Bassma Dep., Def. Exh. 21, p. 68–69, and that plaintiff's request would have been perceived as favoritism. *See Turner*, 482 U.S. at 90, 107 S.Ct. 2254 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."); *Denson*, 59 F.Supp.2d at 159 (accepting the defense argument that allowing plaintiff's "requested accommodation would create logistical and economic problems for the food services division, disrupt the Unit by singling out [plaintiff] for special treatment, increase the number of individual requests made by prisoners, and possibly compromise [plaintiff's] safety").

Defendants likewise argue that the fourth factor—which asks whether there were "ready alternatives" to the denial of plaintiff's request—is satisfied because of the "economic, staffing, and security concerns" already noted. Def. Mem. at 28.

Taken on their own terms, defendants' arguments are not without merit. They are severely—and, to my mind, fatally—undercut, however, by the fact that the DOC began offering a vegetarian diet to all inmates on December 19, 2000. *See* Def. Exh. 22. The Commissioner's memorandum alerting all prison superintendents to the change states that "[t]he Alternative/Vegetarian Diet, which does not contain meat, fish or eggs, was developed to meet the needs of a growing number of inmates who were requesting special diets based on various religious dietary *restrictions*." *Id.* (emphasis in original). Significantly, the memorandum specifically notes that "the Religious Services Handbook will be amended to allow Muslim inmates access to" the new diet. *Id.* This directive contradicts defendants' argument that the dietary restrictions of Muslims and members of the Nation of Islam can be met by a pork-free diet.

Because this change was not implemented until 2000, defendants may still argue that the denial of plaintiff's request passes the reasonable relationship test because granting a single exception would have been disruptive. Such an argument, however, misses the more fundamental point: It was indeed possible for the DOC to accommodate plaintiff's request, as well as the requests of all other similarly situated inmates by offering a vegetarian diet. The fact that defendants began to offer a vegetarian option in December 2000 demonstrates feasibility. Given that it was possible, whether it was *reasonable* for prison officials to do so raises a factual issue. This factual question weighs against the grant of summary judgment.

Further, the fact that the vegetarian diet continues to be offered indicates that it has not been prohibitively costly. *See Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254 ("But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interest, a court may con-

sider that as evidence that the regulation does not satisfy the reasonable relationship standard."). Accordingly, I hereby **DENY** defendants' motion for summary judgment on this ground.

### 3. Defendants Are Not Entitled to Qualified Immunity on Plaintiff's § 1983 Claim

As stated above, the First Circuit has adopted a three-step test for determining whether an official is entitled to qualified immunity:

(1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

*Starlight Sugar, Inc. v. Soto,* 253 F.3d 137, 141 (1st Cir.2001) (citations omitted).

 I previously rejected defendants' argument that they are entitled to qualified immunity on plaintiff's § 1983 vegetarian diet claim in my Memorandum and Order dated March 20, 2002. In that opinion, I first concluded that plaintiff has clearly alleged a deprivation of actual rights under the First Amendment. Second, I found that it was well established by April 1999 that prisoners retain their First Amendment rights inside prison walls. *See O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400. Third, I held that an objectively reasonable official would know that he could not impinge on those rights unless his actions were reasonably related to legitimate penological interests. *See Makin v. Col. Dep't of Corrections,* 183 F.3d

1205, 1210 n. 4 (10th Cir.1999) (recognizing that even if prison officials' qualified immunity defense had not been waived, it would still fail because general free exercise rights relating to a special religious diet were clearly established). Based on my earlier opinion and my conclusion in this opinion that defendants are not entitled to summary judgment on their reasonable relation argument, I again conclude that defendants are not entitled to qualified immunity. The motion for summary judgment is therefore DENIED on this ground.

### 4. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Claim under the Massachusetts Constitution

Article 46, § 1 of the amendments to the Massachusetts Constitution, which dictates that "[n]o law shall be passed prohibiting the free exercise of religion," parallels the First Amendment to the United States Constitution. *Attorney General v. Desilets,* 418 Mass. 316, 320, 636 N.E.2d 233 (1994). Defendants argue that they therefore are entitled to summary judgment on plaintiff's Massachusetts Free Exercise claim regarding denial of the vegetarian diet because any restrictions placed on plaintiff's diet were reasonably related to legitimate penological concerns.[14]

 Despite the similarities between art. 46 and the First Amendment, however, the Supreme Judicial Court has declined to follow the Supreme Court's Free Exercise standard announced in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Id.* Instead, art. 46 is analyzed pursuant to "earlier First Amendment jurisprudence."

---

**14.** Plaintiff alleges denial of his rights under the state constitution on the basis of each factual allegation in the complaint. Defendants argue for summary judgment, however, in relation only to the vegetarian diet allegation.

*Id.* Specifically, the standard is whether a restriction "substantially burdens [the plaintiff's] free exercise of religion and, if it does, whether the Commonwealth has shown that it has an interest sufficiently compelling to justify that burden." *Id.* at 322, 636 N.E.2d 233. A state interest that is merely reasonably related is therefore not enough under Massachusetts law; the government can only meet its burden by establishing an interest that is sufficiently compelling to justify the burden imposed.

 Application of this standard to the case at bar is complicated to a degree by the fact that plaintiff's claim arises in the prison context. In addressing the right to political association, the court tempered the standard, relieving the government of its burden. In *Abdul Alazim,* in determining the constitutionality of a prison policy that burdened "the equally fundamental rights of free speech and association under arts. 1 and 16 of the Massachusetts Declaration of Rights," the Supreme Judicial Court has declined to apply the compelling interest standard. *Abdul–Alazim v. Superintendent,* 56 Mass.App.Ct. 449, 454–55, 778 N.E.2d 946 (2002) (discussing *Mass. Prisoners Assn. Political Action Comm. v. Acting Governor,* 435 Mass. 811, 761 N.E.2d 952 (2002) ("Prisoners PAC")). Rather, the court adopted the more deferential standard generally applied in the prison context: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Prisoners PAC,* 435 Mass. at 819, 761 N.E.2d 952. The court acknowledged "the difficulty that prison officials face in the operation of prisons" and ex-

pressly rejected the compelling state interest standard for review of prison policies and regulations. *Id.* at 819–20, 761 N.E.2d 952.

But the Supreme Judicial Court has not altered the standard in the context of the free exercise of religion. *See Abdul–Alazim,* 56 Mass.App.Ct. at 453, 778 N.E.2d 946 ("The Supreme Judicial Court has not addressed the constitutional standard governing review of a prison policy that burdens free exercise rights protected by art. 46, § 1"). Indeed, when presented with the issue in *Abdul–Alazim,* the Appeals Court "decline[d] to enter the thicket of free exercise law" by finding that plaintiff would prevail regardless of which standard was applied.[15] *Id.* at 456, 778 N.E.2d 946.

In adopting a more deferential review of prison regulations in *Cacicio,* the Supreme Judicial Court found that the stricter, *Turner* analysis was necessary for the "regulation of activities which may pose a serious threat to prison order and security." *Cacicio v. Secretary of Public Safety,* 422 Mass. 764, 665 N.E.2d 85 (1996). Both *Cacicio* and *Prisoners PAC* dealt with the threat to prison security created by free speech and freedom of association claims.

Plaintiff's claim, in contrast, relates to religious freedom. As noted in *Abdul–Alazim,* the Supreme Judicial Court has not extended the "reasonably related" test to the free exercise context, and I will not do so here. Free exercise claims may well be distinguishable from the freedom of speech and association at issue in *Prisoners PAC.* The potential for inmate coercion and illegal organizing and the consequent "serious threat to prison order and securi-

15. Cf. *Rashad v. Maloney,* 2003 WL 1906778 (Mass.Dist.Ct.2003) (noting that the Supreme Judicial Court "has expressly adopted *Turner's* deferential standard of review" for claims involving the exercise of fundamental rights by prisoners, but also recognizing that the application of the *Turner/O'Lone* test to free exercise claims "may be an open question").

ty" in the latter context may not extend to free exercise.

Even if I found that the "reasonably related" test applies in the free exercise context, however, defendants could not prevail here. For the reasons stated in the section of this opinion dealing with plaintiff's diet claim under § 1983, I do not believe defendants are entitled to summary judgment even under this defendant-friendly standard. I therefore DENY defendants' motion for summary judgment on this ground.

### 5. Defendants Are Not Entitled to Summary Judgment on Plaintiff's M.G.L. c. 127, § 88 Claim

 In contrast to the "compelling interest" test in the federal constitutional context, the applicable Massachusetts statute adopts a more deferential standard. Massachusetts General Law c. 127, § 88 provides:

> An inmate of any prison or other place of confinement shall not be denied the free exercise of his religious belief and the liberty of worshiping God according to the dictates of his conscience in the place where he is confined .... This section shall not be so construed as to impair the discipline of any such institution so far as may be needful for the good government and the safe custody of its inmates....

Defendants argue that they are entitled to summary judgment on plaintiff's claim under the statute regarding denial of the vegetarian diet because any restrictions placed on plaintiff's diet were reasonably related to legitimate penological concerns.[16] See Jackson v. Hogan, 388 Mass.

376, 381, 446 N.E.2d 692 (1983) (defendants entitled to summary judgment on c. 127, § 88 claim regarding access to group religious services where defendants determined that plaintiff was a security risk and offered to arrange for private visits with a Muslim chaplain).

In interpreting M.G.L. c. 127, § 88, courts have adopted a reasonable relationship test that matches the federal constitutional standard. See Abdul–Alazim, 56 Mass.App.Ct. at 455 n. 10, 778 N.E.2d 946 (noting that this statute is "in accord" with the analysis of O'Lone v. Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), which held that the reasonable relationship standard set the appropriate constitutional balance between inmate's rights and penological concerns). For the reasons stated in the section of this opinion dealing with plaintiff's diet claim under § 1983, I do not believe that defendants are entitled to summary judgment. I hereby **DENY** defendants' motion for summary judgment on this ground.

### E. Claims Related to Confiscation of The Five Percenter at SBCC

### 1. Plaintiff's § 1983 Claim Is Not Barred by the PLRA

As noted above, the PLRA requires prisoners challenging prison conditions to exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a). Defendants argue that plaintiff did not file a grievance regarding the confiscation of The Five Percenter and again note that plaintiff was clearly familiar with the grievance process.

---

**16.** Plaintiff alleges denial of his rights under the statute on the basis of each factual allegation in the complaint. Defendants argue for summary judgment, however, in relation only to the vegetarian diet and Five Percenter alle-

gations. Defendants' argument for summary judgment relating to confiscation of The Five Percenter is addressed in a subsequent section of this memorandum.

As plaintiff correctly asserts, however, classification decisions[17] are not grievable. 103 C.M.R. § 491.08(1). Indeed, defendants themselves concede that once *The Five Percenter* was deemed contraband, the confiscation became a nongrievable matter. Def. Mem. at 36. Plaintiff clearly could not exhaust an administrative remedy that was unavailable to him. I therefore **DENY** defendants' motion for summary judgment on this ground.

### 2. Defendants Are Not Entitled to Summary Judgment on the Ground that Confiscation of The Five Percenter Was Reasonably Related to Legitimate Penological Concerns

Plaintiff argues that the confiscation of his *Five Percenter* newspapers violated his rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment. Defendants argue that they are entitled to summary judgment because their actions were reasonably related to legitimate penological concerns.[18]

In *Thornburgh v. Abbott*, the Supreme Court applied the reasonable relationship standard from *Turner* to Bureau of Prisons regulations authorizing the seizure of inmates' publications. 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Defendants argue that the first factor of the standard is satisfied because their confiscation of plaintiff's newspapers was related to prison security, a purpose the Supreme Court has declared "central to all other corrections goals." *Pell v. Procunier*, 417 U.S. at 823, 94 S.Ct. 2800. Specifically, defendants note that the Five Percenter sect has been labeled a Security Threat Group ("STG") by the IPS division. *See* Fisher Dep., Def. Exh. 11, p. 52.[19] Other courts have upheld the application of the STG designation to the Five Percenters. *See, e.g., Long Term Administrative Segregation*, 174 F.3d 464, 465 (4th Cir.1999); *Self–Allah v. Annucci*, 1999 WL 299310, at *9 (W.D.N.Y.1999). And defendants contend that Leabman and Fisher individually reviewed both newspapers and determined that they posed a security risk before deeming them contraband.[20] *See Thornburgh*, 490 U.S. at 416, 109 S.Ct. 1874 ("[W]e are comforted by the individualized nature of the determinations required by the regulation.").

Defendants again argue that plaintiff was afforded numerous alternative means

---

17. This term is not defined in the regulations. In the portion of defendants' memorandum dealing with plaintiff's retaliatory transfer claim, however, defendants repeatedly refer to his transfer as a "classification" decision. Def. Mem. at 44.

18. In addition, defendants Bassma, Mendosa, and Hughes note that plaintiff has not alleged any facts linking them to the confiscation of plaintiff's newspaper and move for dismissal of all confiscation claims against them. I agree that plaintiff has failed to link these defendants to the confiscation and hereby **GRANT** the motion for summary judgment on this ground.

19. The relevant answer in Fisher's deposition is cut off mid-sentence, but it appears that he was explaining that the Five Percenters have in fact been designated an STG.

20. Such a review is mandated by 103 C.M.R. § 481.15(3)(a):

The deputy superintendent may reject a publication within a reasonable time from receipt only to prevent interference with institutional goals of security, order, rehabilitation, or if it might facilitate, encourage or instruct in criminal activity. The deputy superintendent may not reject a publication solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant.

Defendants do not, however, support this assertion with deposition testimony, affidavits, or any other documentary evidence.

of practicing his religion, satisfying the second *Turner* factor. And they assert that allowing plaintiff access to the newspapers would have posed a security risk to prison guards and inmates alike under the third factor. In satisfaction of the fourth factor, defendants argue that there were no alternatives to confiscation because "it is not the content of the publication that poses a threat to penological interests, but rather the mere presence of it within the facility." Def. Mem. at 37.

▮▮▮ Defendants' arguments are fatally flawed for two reasons. First, defendants place great emphasis on the argument that the publication plaintiff sought was published by an STG and thus posed a security threat. Defendants have not proffered facts specific to this case and this setting, however, as to why the DOC deemed the Five Percenter sect an STG or why these particular editions of *The Five Percenter* posed a security risk. Prison officials may not escape liability simply by declaring that deference is owed to their security determinations. The point raised in the Court's March 20, 2002, Memorandum and Order is apt: Although in other situations *The Five Percenter* has been withheld from prisoners based upon a showing that it was a sign of gang affiliation and that it incited violence, the defendants have made no such showing in the case at bar at this time, in this setting, under these circumstances. *Compare Self–Allah v. Annucci*, 1999 WL 299310 (W.D.N.Y.1999) (detailing extensive factual record). Moreover, defendants have offered no support for their contention that Leabman and Fisher conducted an individualized review.

The second, and related, problem with defendants' reasoning is that their arguments under the third and fourth factors are completely circular. Essentially, defendants argue that because *The Five Per-*

*center* was contraband, it posed a security risk. Such an argument cannot be used to evade review even under *Turner*'s deferential reasonable relation standard. Accordingly, I hereby **DENY** defendants' motion for summary judgment on this ground.

### 3. *Defendants Are Not Entitled to Qualified Immunity on Plaintiff's § 1983 Claim*

▮▮▮ I previously rejected defendants' qualified immunity arguments relating to both plaintiff's vegetarian diet and *Five Percenter* claims in my March 20, 2002 opinion. I again rejected defendants' qualified immunity argument as related to the vegetarian diet claim earlier in this opinion, and now reject that argument as related to plaintiff's *Five Percenter* claim.

In my previous opinion, I first concluded that plaintiff has clearly alleged a deprivation of actual rights under the First Amendment. Second, I found that it was well established by April 1999 that prisoners retain their First Amendment rights inside prison walls. *See O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400. Third, I held that an objectively reasonable official would know that he could not impinge on those rights unless his actions were reasonably related to legitimate penological interests. *See Makin v. Col. Dep't of Corrections*, 183 F.3d 1205, 1210 n. 4 (10th Cir.1999) (recognizing that even if prison officials' qualified immunity defense had not been waived, it would still fail because general free exercise rights relating to a special religious diet were clearly established). Based on my earlier opinion and my conclusion in this opinion that defendants are not entitled to summary judgment on their reasonable relation argument, I conclude that defendants are not entitled to qualified immunity. The motion for summary judg-

ment is therefore **DENIED** on this ground.

### 4. *Defendants Are Not Entitled to Summary Judgment on Plaintiff's M.G.L. c. 127, § 88 Claim*

█ As noted above, M.G.L. c. 127, § 88 states that no prisoner "shall be denied the free exercise of his religious belief" and incorporates the reasonable relationship standard that is also applied under federal law. *See* M.G.L. c. 127, § 88; *Abdul–Alazim,* 56 Mass.App.Ct. at 455 n. 10, 778 N.E.2d 946 (noting that the statute is "in accord" with the analysis of *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), which held that the reasonable relationship standard set the appropriate constitutional balance between inmates' rights and penological concerns). Defendants argue that they are entitled to summary judgment on plaintiff's claim under the statute because confiscation of *The Five Percenter* was reasonably related to legitimate penological concerns. For the reasons set out in the preceding section of this opinion, I do not believe that defendants have established that the confiscation was reasonably related to legitimate penological concerns. I hereby **DENY** defendants' motion for summary judgment on this ground.

### F. *Plaintiff Has Not Alleged Facts Sufficient to Meet the Legal Standard for Retaliatory Transfer from SBCC*

Plaintiff alleges that defendants retaliated against him by transferring him from SBCC to SECC after he attempted to exercise his First Amendment rights. Defendants argue that they are entitled to summary judgment on all Counts relating to this allegation because the facts alleged by plaintiff are insufficient to meet the legal standard for retaliatory transfer.

█ Prison administrators are afforded "extremely broad" latitude in making transfer decisions. *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979). "However, [a plaintiff] may nevertheless establish a claim under § 1983 if the decision to transfer him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Id.* In this Court's Memorandum and Order dated March 20, 2002, I set out the standard for a First Amendment retaliation claim under § 1983:

> [P]laintiff must demonstrate that (1) the speech was constitutionally protected; (2)[he] suffered an adverse ... decision; and (3) there was a causal connection between the speech and the adverse ... determination against [him], so that it can be said that [his] speech was a motivating factor in the determination.

*Wheeler v. Natale,* 178 F.Supp.2d 407, 410 (S.D.N.Y.2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

█ The First Circuit, however, has held that this standard is more defendant-friendly in the prison context, as "[p]laintiff must prove that he would not have been transferred 'but for' the alleged reason." *McDonald,* 610 F.2d at 18. "[T]he requirement of a 'but for' showing together with the wide latitude afforded prison officials in ordering transfer may make summary judgment particularly appropriate." *Id.* at 18–19.

█ Defendants have proffered evidence they believe demonstrates a specific penological reason for plaintiff's transfer. Their evidence, however, is incoherent. They first note that the transfer of which plaintiff complains was from a level six to a level four facility, meaning that plaintiff

was transferred to a lower security prison. Because "movement to lower security is deemed beneficial and shows that the inmate is being given more independence and personal responsibility," they argue that the transfer cannot be deemed punitive. Def. Mem. at 45.

They go on to argue, though, that defendant's transfer was "the result of his own poor conduct" at SBCC—contending, in other words, that the transfer was punitive but deserved. Defendants point to two disciplinary incidents they contend precipitated plaintiff's transfer. First, on February 4, 1999, plaintiff was found to be in possession of a shank hidden in a canister of baby powder in his cell. *See* Disciplinary Report # 99–0212, Def. Exh. 33. Second, on April 15, 1999, plaintiff was cited for insolence to a staff member for telling Officer Catherine McGuirk, "I have something to say to you and I would like you to keep it confidential. I've been attracted to you since you conducted my classification board hearing in mid-March." *See* Disciplinary Report # 99–0876, Def. Exh. 32. On April 20, 1999, plaintiff wrote a letter to McGuirk apologizing for his "insolent comment." *See* Inmate Request to Staff Member, Def. Exh. 32. In addition, defendants argue that plaintiff's "numerous enemies" at SBCC demonstrate why defendants deemed his transfer advisable.

 Although there are inconsistencies in defendants' arguments, I hereby **GRANT** summary judgment in their favor on the retaliatory transfer claim. The First Circuit has counseled that "[t]he mere chronology [21] alleged in the complaint, while sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have produced evidence of a legitimate reason [for transfer]." *Layne v. Vinzant,* 657 F.2d 468, 476 (1st Cir.1981). Defendants have presented evidence of two disciplinary infractions preceding plaintiff's transfer. Though these infractions conceivably could have provided a basis for transferring plaintiff, it is difficult to imagine that they in fact prompted plaintiff's transfer—and to a level four facility, at that. More compelling, in my view, is defendants' reference—admittedly oblique—to plaintiff's "numerous enemies" in the prison. Def. Mem. at 44.

This, in fact, is the basis for plaintiff's other suit pending before this Court, docket # 01–10699. As summarized in an October 1, 2001, Memorandum and Order re: Motion to Dismiss in that case, plaintiff alleges that prison officials at MCI–CJ and SBCC failed to protect him from repeated assaults by other inmates from April through November 1998. Of particular salience, I noted that "[o]n December 8, 1998, prison officials recommended that Shahid–Muhammad be screened for out of state placement, based on his ongoing issues with enemies in the prison." [22] Though defendants certainly could have

---

21. The bare chronology alleged in the complaint is as follows:

 On or about June 24, 1999, Shaheed–Muhammad was transferred from SBCC to SECC. Although Shaheed–Muhammad was informed that the transfer was "pending classification," upon information and belief, the transfer was improperly motivated by retaliation for Shaheed–Muhammad's attempts to exercise his First Amendment right to religious freedom while incarcerated. Upon information and belief, DiPaolo

approved the transfer as "punishment" to Shaheed–Muhammad for his exercise of his First Amendment rights.

In his deposition, plaintiff stated that he "did not know" how any of the defendants had been involved in his allegedly retaliatory transfer. Def. Exh. 4, p. 49–54.

22. In the instant motion for summary judgment, defendants argue that plaintiff himself requested an out of state transfer, but there is no support in the record for that assertion.

expounded on this argument in their motion for summary judgment, I believe that their reference to plaintiff's "numerous enemies" at SBCC, in combination with the Court's 2001 Memorandum and Order, is evidence of a "legitimate reason" for transfer. *Layne,* 657 F.2d at 476. Accordingly, I hereby **GRANT** the motion for summary judgment on this ground and **DISMISS** all claims arising from the retaliatory transfer allegation.

### G. *Plaintiff May Seek Compensatory Damages under § 1983*

■ Finally, defendants argue that the PLRA precludes plaintiff from seeking compensatory damages under § 1983 because he fails to allege a physical injury. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.").

I addressed the scope of § 1997e(e) in a Memorandum and Order issued on March 19, 2001, concluding as follows:

> Where the harm that is constitutionally actionable *is* physical or emotional injury occasioned by a violation of rights, § 1997e(e) applies. In contrast, where the harm that is constitutionally actionable is the violation of intangible rights—regardless of actual physical or emotional injury— § 1997e(e) does not govern.

*Shaheed–Muhammad,* 138 F.Supp.2d at 107 (emphasis in original). I noted that the purpose of the PLRA was to curb lawsuits for "insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety." *Id.* at 109 (quoting 141

Cong. Rec. S14408–01, *S14413 (Sept. 27, 1995) (statement of Sen. Dole)). Lawsuits in which constitutional issues predominate were not the focus of the PLRA. Accordingly, I reasoned that the violation of a constitutional right is an independent injury that is immediately cognizable and outside the purview of § 1997e(e).

The First Circuit has not addressed this question, and other courts are split. The D.C. and Eleventh Circuits have concluded that prisoner suits alleging constitutional violations without accompanying physical injury must be dismissed in their entirety. *See Harris v. Garner,* 216 F.3d 970, 984 (11th Cir.2000) (en banc) (holding that the language "no action shall be brought" operates as a bar to a prisoner's entire suit absent physical injury); *Davis v. District of Columbia,* 158 F.3d 1342, 1348–49 (D.C.Cir.1998) ("[Section] 1997e(e) precludes claims for emotional injury without any prior physical injury, regardless of the statutory or constitutional basis of the legal wrong.").

The Seventh and Ninth Circuits, on the other hand, have concluded that suits alleging constitutional violations are outside the purview of 1997e(e). *See Rowe v. Shake,* 196 F.3d 778, 781 (7th Cir.1999) ("[Section] 1997e(e) applies only to claims for mental or emotional injury. Claims for other types of injury do not implicate the statute.") (citations omitted); *Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir. 1998) ("[T]he deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment [c]laims regardless of the form of relief sought."). *See also Williams v. Ollis,* 230 F.3d 1361 (6th Cir. 2000) (in an unpublished opinion, reversing the district court and allowing prisoners to argue for nominal, compensatory, and pu-

nitive damages flowing from a violation of his First Amendment rights).

Still other courts have chosen a middle path, holding that claims for constitutional violations absent physical injury need not be dismissed outright, but that § 1997e(e) limits recovery to nominal and punitive damages (in addition to injunctive and declaratory relief). These courts reason that allowing compensatory damages in the absence of physical injuries would amount to recovery for mental or emotional injury. *See, e.g., Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002); *Allah v. Al–Hafeez,* 226 F.3d 247, 250 (3d Cir.2000); *Royal v. Kautzky,* 375 F.3d 720, 722–23 (8th Cir. 2004); *Searles v. Van Bebber,* 251 F.3d 869, 875–76 (10th Cir.2001). *See also Meade v. Plummer,* 344 F.Supp.2d 569 (E.D.Mich.2004) (collecting cases).

Along with the Seventh and Ninth Circuits, I continue to believe that § 1997e(e) is inapplicable to suits alleging constitutional injuries. The PLRA does not, therefore, limit the type of relief that may be sought. Accordingly, I conclude that plaintiff is entitled to seek compensatory damages and **DENY** the motion for summary judgment on this ground.

## IV. *CONCLUSION*

For the reasons stated above, I hereby **GRANT** the motion for summary judgment with respect to plaintiff's § 1983 claim regarding the medallion confiscation. I also **GRANT** the motion with respect to all of plaintiff's claims regarding retaliatory transfer. Finally, I **GRANT** the motion with respect to claims regarding confiscation of *The Five Percenter* against Bassma, Mendosa, and Hughes. I **DENY** the motion in all other respects.

**SO ORDERED.**