**Prince MOSES, David A. Josselyn, Kevin King, Gary Emerson, Tyran Daniels, Jeffrey Doucette, Henry Laplante, Jose Sime, Christopher Wolinski Nicholas Boccio, William Tyree, James Ware, Kevin Galford, Plaintiffs**

**v.**

**Kathleen DENNEHY, James R. Bender, as he is Commissioner of the Massachusetts Department of Corrections,\* Defendant.**

**Civil Action No. 06–10164–WGY.**

United States District Court,
D. Massachusetts.

Nov. 19, 2007.

cial capacity. Compl. at 1 [Doc. 1]. James R. Bender is the present Commissioner of Corrections. James R. Bender Aff. [Doc. No. 15] ¶ 1. Following the usual practice, his name has been substituted for that of Kathleen Dennehy in her official capacity.

Kevin A. Anahory, Department of Correction, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

## I. INTRODUCTION

The Plaintiffs (collectively "the Prisoners"), are inmates of Massachusetts Department of Correction ("Department"). They claim that a ban on all sexually explicit publications and items within the prison violates their First Amendment right to free expression. The Defendants, Kathleen Dennehy ("Dennehy") and James Bender, are the former and current Commissioners of the Department respectively. The Prisoners and the Defendants have both moved for summary judgment.

## II. FACTUAL BACKGROUND

Each of the Prisoners is incarcerated in an institution run by the Department. Until recently, they received and possessed without issue publications and pictures containing sexually explicit material.

In 2000, the Department conducted a review of inmate mail procedures in all of its facilities. As part of the review, each institution was required to compile all reports of incidents of a sexual nature that had occurred in the previous two years. Defs' Mem. Sup. Sum. J. [Doc. No. 15], at 3. Sexually explicit materials played some role in several of the 275 compiled incident reports. *Id.* The Department determined on the basis of these reports that the existence of sexually explicit materials in prison facilities was detrimental to prison security and the Department's rehabilitative efforts, and that it promoted the sexual harassment of female prison guards. *Id.* After making this determination, the Department promulgated a new regulation, 103 CMR 481.01, banning the receipt, possession, and display of nearly all materials containing nude or semi-nude images or sexually explicit content. Exempted from this rule were nude depictions illustrative of "medical, educational, or anthropological content." 103 CMR 481.06.

Pursuant to this change in policy, the Department began banning certain subscriptions and preventing prisoner receipt of other materials such as books, pictures, postcards and individual issues of magazines. Each of the Prisoners here was denied receipt of at least one item pursuant to 103 CMR 481.00. They brought the current suit alleging that the ban violates their First Amendment right to expression. Am. Compl. [Doc. No. 4] ¶ 26. In addition, one of the Prisoners, Nicholas Boccio, amended his complaint to include several causes of action under state law. Mot. for Leave to Amend [Doc. No. 24].[1]

Dennehy brought the present motion on May 31, 2007, requesting summary judgment as matter of law under Fed.R.Civ.P. 56 that the prison regulation is constitutional and that they are entitled to qualified immunity. Mot. for Sum. J., at 6, 12.

## III. DISCUSSION

### A. Legal Setting

The First Amendment "embraces the right to distribute literature and necessarily protects the right to receive it." *Martin v. City of Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (internal citation omitted). Nevertheless, the right to receive publications free from government regulation is subject to the same limitations as speech in general, including the restrictions on obscene speech. *See Smith v. California,* 361 U.S. 147, 152, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) ("[O]bscene speech and writings are not protect-

---

1. Boccio also filed a motion to be severed from the "class." Mot. to Sev. [Doc. No. 24]. The current action, however, is not a class action. *See* Am. Compl. [Doc. No. 4]. The motion to sever is denied.

ed by the constitutional guarantees of freedom of speech and the press."). The question before the Court is whether the instant restrictions on inmate mail are justified given the setting and the government's proffered interest.

While prison walls may isolate their inhabitants from the rest of society, they do not necessarily separate them from the constitutional protections afforded to all citizens. *See Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). Even so, the judiciary is ill-equipped to administer and regulate the day-to-day activities of penal institutions. *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). The management of such facilities requires expertise, knowledge, and skills that are the proper responsibility of other branches of government. *Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254. Federal courts ought afford a high level of deference to the decisions made by prison officials, especially at state-run facilities. *Id.* This is particularly true where prison officials have provided individualized review of the banned items. *See Thornburgh v. Abbott*, 490 U.S. 401, 416, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *see also Shaheed–Muhammad v. Dipaolo*, 393 F.Supp.2d 80, 103 (D.Mass.2005)(Gertner, J.).

Needs particular to the management of prison populations often require regulations that may impinge upon the established rights of prisoners. In *Turner*, the Supreme Court set forth the framework for determining where the rights of prisoners must cede to this necessity. *Id.* at 89–91, 107 S.Ct. 2254. Although courts generally view governmental regulations that impede fundamental rights under a strict scrutiny analysis, the Supreme Court stated that the particular needs of the prison

environment dictated a reduced level of scrutiny. *Id.* at 89, 107 S.Ct. 2254 ("Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."). The Court announced that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.*

*Turner* instructs courts to employ a four-factor test to determine whether a regulation on correspondence violates a prisoner's constitutional rights. *Id.* at 89–91, 107 S.Ct. 2254. The first factor requires that the regulation be rationally related to a legitimate governmental objective unrelated to the suppression of speech. *Id.* at 89, 107 S.Ct. 2254. The regulation of expression is considered neutral under *Turner* where the distinction between publications is based solely on whether they interfere with a legitimate interest. *See Thornburgh*, 490 U.S. at 415–16, 109 S.Ct. 1874. The second factor deals with the availability of alternative forms of expression. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. The third and fourth factors relate to the effect of accommodating the right and the availability of alternative remedies. *Id.* at 90–91, 107 S.Ct. 2254.

■ The analysis of the first *Turner* factor is comprised of three distinct aspects. The first aspect requires a legitimate governmental interest. In addition, the regulation must be neutral on its face and logically connected to this interest. *Id.* at 89–90, 107 S.Ct. 2254. These include the prison's interest in security and rehabilitation. *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir.1999).

The second *Turner* factor addresses the availability of alternative means of expression. In analyzing this factor, courts must view the right claimed "sensibly and expansively." *Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874. For example, in *Amatel v. Reno*, 156 F.3d 192, 201 (D.C.Cir.1998), the D.C. Circuit held that alternative means of expression were available in a prison despite a complete ban on sexually explicit material. The alternative means of expression did not need to provide avenues for expressing sexually explicit content; rather, the alternative means had to provide an inmate with the ability to express non-sexually explicit content. *Id.*

The third *Turner* factor turns on whether accommodating the claimed right would reduce or inhibit the safety and liberty of other members of the prison community. *Turner*, 482 U.S. at 91, 107 S.Ct. 2254.

The final *Turner* factor considers whether there are readily apparent, viable alternatives that could accommodate the prisoners' rights. *Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254. In keeping with the high level of deference owed to prison officials' decisions, this factor does not require a least restrictive means analysis. *Id.* Prison officials need not "set up and shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* Instead, the burden is on the prisoner to demonstrate that the regulation is actually arbitrary because an alternative exists that could fully accommodate the right at a *de minimis* cost. *Id.* at 91, 107 S.Ct. 2254. In keeping with the policy of providing greater freedom in the administration of prison facilities, this analysis is deferential to the government's position. *See id.* at 84–85, 107 S.Ct. 2254.

Although the moving party at this summary judgment stage must demonstrate that it is entitled to judgment as matter of law, *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir.2006), the Prisoners bear the burden of demonstrating that the regulation is wholly arbitrary. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 153–54 (1938). Rational relationship scrutiny is, however, not a "toothless" standard. *Thornburgh*, 490 U.S. at 414, 109 S.Ct. 1874. Even where a regulation is facially valid, there is still a possibility that a plaintiff could show it to be wholly irrational in its application. *Carolene Prods.*, 304 U.S. at 153–54, 58 S.Ct. 778. Most pointedly, "[p]rison officials may not escape liability simply by declaring that deference is owed to their security determinations." *Shaheed–Muhammad*, 393 F.Supp.2d at 104.

## B. Analysis

### 1. The Challenged Regulation—103 CMR 481

#### a. Rational Relationship

■ Dennehy articulates several legitimate governmental interests for the regulation. She claims that allowing sexually explicit material is "detrimental to rehabilitation, and the safety and the security of the institutions, and also encouraged the sexual harassment of female staff members." Defs' Mem. Sup. Sum. J., at 3. These are each legitimate interests the government properly may seek to promote. *See Mauro*, 188 F.3d at 1059. Moreover, these interests are not related solely to the suppression of expression and are neutral on their face. *See Thornburgh*, 490 U.S. at 415, 109 S.Ct. 1874. Dennehy satisfies the first two aspects of the first *Turner* factor. *See id.* The third aspect, however, must still be present for this factor to weigh in her favor.

The Prisoners correctly observe that several of the justifications that Dennehy advances do not support a rational relationship between the institution's goals

and the general banning of publications containing nudity.[2] Although none of the incidents Dennehy presents involves the publications that the Prisoners claim were confiscated, *see* Defs' Mem. Sup. Sum. J., at 9–10, some of the reported incidents demonstrate a logical link between sexually explicit materials and the break-down of security in the prisons. *Id.* One such incident, involving a group of inmates initiating a sexual assault on another inmate by first showing him "dirty" pictures and masturbating around him, *Id.,* is especially telling. The use of sexually explicit material in the course of a sexual assault demonstrates that such material impairs the security of the prison. Although this factor weighs in favor of Dennehy's motion, this Court must still analyze the remaining factors of the *Turner* test in order to make its determination.

### b. Alternative Means of Expression

■ The second *Turner* factor deals with the availability of alternative forms of expression. Here, alternative means of expression are available. The department allows for "a broad range of publications to be sent, receive, and read," publications devoid of nudity or sexually explicit material. *See Thornburgh,* 490 U.S. at 418, 109 S.Ct. 1874; Am. Compl. ¶¶ 8, 13, 19. The Prisoners, in fact, do not claim that their receipt of other publications has been obstructed, or that there is a general dearth of published material allowed into the prison. *See* Am. Compl. In addition, although the prison need not provide alternative means of expressing sexually explicit content, *Amatel,* 156 F.3d at 200, the regulation in question actually provides an exception for nude images that contain "medical, educational, or anthropological content." 103 CMR 481.06. This is an alternative means of expression more than sufficient to satisfy the concerns implicated in *Turner. See Amatel,* 156 F.3d at 200. Thus, the second *Turner* factor likewise weighs heavily in the Department's favor.

### c. Accommodation of the Right

■ A prison regulation is more reasonable when accommodating the claimed right could adversely impact the rights of other inmates. *See Turner,* 482 U.S. at 92, 107 S.Ct. 2254. In this case, as previously indicated, admission of sexually explicit content into the facility could affect the safety and security of other inmates and prison personnel. Defs' Mem. Sup. Sum. J., at 10. Accommodating the Prisoners' claimed right, therefore, could negatively affect the rights of others in the prison community. *See Turner,* 482 U.S. at 92–93, 107 S.Ct. 2254. This factor thus supports Dehheny's position that no violation has been effected by the regulation.

### d. Alternatives to the Regulation

■ The Prisoners argue that there are simple alternatives to the ban that would accommodate their claimed right at a de mimimis cost. *Id.* at 93, 107 S.Ct. 2254. After all, there could be an alternative that accounts for the needs of both parties and so simple and inexpensive that the ban is arbitrary by comparison. *See id.*

Here, however, the Prisoners have not demonstrated that such a simple alternative exists. *See id.* The Prisoners argue that individualized review both of the spe-

---

**2.** For example, catching an inmate masturbating in front of a female guard, with no indication that he then possessed or had recently viewed nude images, does not support the government's argument that banning publications featuring nudity is somehow related to security, rehabilitation, or the protection of female prison officials. *See* Mem. Sup. Sum. J., at 10.

cific material and the individual prisoner seeking it would protect both the Department's interests and the Prisoners' constitutional rights at a minimal additional cost. Pls' Mem. Op. Sum. J. and Mt. for Sum J. [Doc. No. 18], at 9–10. They cite the use of pornography in some forms of therapy for sex offenders as demonstrating that the Department already has the capabilities to make such reviews. *Id.* at 10.

These observations, however pertinent, do not end the matter. Dennehy provided this Court with an affidavit of James R. Bender, the current Commissioner, which indicated that the Department lacks the staff necessary to undertake such reviews. James R. Bender Aff. ¶ 9. Moreover, the Department lacks the resources to prevent admitted sexually explicit material from being "passed around" to inmates who ought not be permitted to possess such material. *Id.* This Court, of course, must afford substantial deference to the determinations of prison officials, *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254, and given the Department's findings in this regard, this Court cannot see the Prisoner's argument as demonstrating the existence of a clear alternative at a *de minimis* cost. *See Turner,* 482 U.S. at 92–93, 107 S.Ct. 2254. Thus, this factor also works in the Department's favor.

The Court is thus satisfied that a ban on nude, semi-nude, or sexually explicit material is not wholly irrational or arbitrary on its face with respect to prison safety. The Court therefore holds, as matter of law, that there is a rational relationship between the banning of sexually explicit material and the safety and rehabilitation efforts of the Department. Accordingly, 103 CMR 481 is a constitutionally valid prison regulation.

### 2. Application of 103 CMR 481

█ The ruling, however, is not dispositive of the motion. The Prisoners have an opportunity to demonstrate that the actual application of the regulation violates their rights. *See Carolene Prods. Co.,* 304 U.S. at 153–54, 58 S.Ct. 778.

The burden is on the Prisoners to demonstrate that the rule "as applied to a particular article is without support in reason." *Id.* Proving that a class of publications threatens prison security does not logically prove that **all** publications implicate that concern. *See id.* Only publications that reasonably fall within the prohibited class run afoul of the stated interests and thus can be reasonably banned. *See id.*

In *Shaheed–Muhammad,* the court dealt with a First Amendment challenge to the banning of a religious publication by a group called The Five Percenter. 393 F.Supp.2d at 103–04. The Department argued that the group had been deemed and judicially upheld as a Security Threat Group,[3] and thus the ban was rationally related to the security of the prison. *Id.* at 103. The court denied summary judgment because the Department failed to "proffer[ ] facts specific to this case and this session ... or *why these particular editions of The Five Percenter posed a security risk.*" *Id.* at 104 (emphasis added). Whether a particular publication represents a security threat to a particular institution is, therefore, in part a factual issue. *See id.*

There is a meaningful distinction between the present dispute and the one addressed in *Shaheed–Muhammad.* A religious newsletter, although associated with a Security Threat Group, will not necessarily implicate security concerns at

**3.** A Security Threat Group is a group that poses a threat to the institutional security of prisons. *Shaheed–Muhammad,* 393 F.Supp.2d at 103.

every institution. *See id.* at 104. The court in *Shaheed–Muhammad* held that in some situations and institutions, a publication like The Five Percenter might not represent a threat at all. *Id.* Therefore, the court could not rule as matter of law that the claimed issues presented a danger without competent evidence to support such a ruling. *Id.*

This Court has the ability to take judicial notice of indisputable adjudicative facts. Fed.R.Evid. 201. Such facts must be generally known within the jurisdiction or readily ascertainable by resort to reliable resources. *Id.* There is a publishing category of sexually explicit magazines— Playboy and Penthouse are examples— that necessarily implicates the Department's legitimate goals. Such magazines, whatever their literary pretensions, always contain sexually suggestive images. This is the entire thrust of their advertizing, their public image, their very *raison d'etre.* The Department need not provide evidence with respect to each issue of such publications; demonstrating that they invariably contain sexually explicit material is satisfactory.

This Court takes judicial notice of the generally known fact that the following claimed publications invariably contain nude or semi-nude depictions, or sexually explicit content:

> Purely 18, Fox, Hustler, Adult Cinema Review, House Roses, Black Tail, Black Gold, De Unique, Black Video Illustrated, Celebrity Skin, Plumpers, Over 40, Over 50, High Society, Chic, Oui, Lollypops, Asian Beauties, Shaved Orientals, Barely Legal, Asian Fever, Asian Lace, Penthouse, Salsa, Celebrity Sleuth, Hawk, Gallery, Easy Rider, Biker, Outlaw Biker, In The Wind, American Curves, Spanish Maxim, Paper Wings, Stuff, Maxim, and FHM.

As such publications invariably contain sexually explicit content, no reasonable jury could find that their banning is wholly irrational or arbitrary in light of the Department's stated goals. With respect to these publications, the Prisoners cannot possibly succeed in claiming that their ban is "without support in reason. . . ." *See Carolene Prods. Co.,* 304 U.S. at 153–54, 58 S.Ct. 778. Accordingly, defendants' motion for summary judgment is granted with respect to the claims for these publications.

The Prisoners, however, properly claim other items for which judicial notice would not be proper. A publication that may from time to time feature scantily clad or nude depictions may not always implicate the Department's concerns. For example, while some issues of National Geographic may contain nudity, this is not invariably true. Whether a particular issue produced by that society contains images that implicated the Department's concern is a fact not generally known, and which cannot be known without looking at the issue or individual publication itself. *See* Fed.R.Evid. 201. Judicial notice of such a fact would be improper as well as potentially inaccurate. *See* Fed.R.Evid. 201. A ban on a National Geographic publication, therefore, without any evidence that the particular issue or book contained sexually explicit material, would not satisfy the government's burden at this stage in the proceedings.

A publication such as National Geographic implicates a further concern of this Court. The regulation in question exempts nude depictions that are "medical, educational, or anthropological" in nature. 103 CMR 481.06. This seems to demonstrate the Department's understanding that not all nudes necessarily implicate security or rehabilitation concerns to the same degree. Not every nude or scantily

clad figure will, after all, appeal to a prisoner's "prurient interests" or excite the same passions implicated in the incident reports. This Court has difficulty concluding, as matter of law, that there is a rational relationship between prison security and the banning of, for example, postcards featuring "Masterpiece Paintings," which may contain classical nudes. *See Shaheed–Muhammad,* 393 F.Supp.2d at 103–04. As such, without some evidence that individual publications of this sort actually pose a threat to either security or rehabilitation, this Court cannot rule their prohibition constitutional as matter of law. *See id.*

With all this in mind, however, this Court must still afford substantial deference to the prison officials' individualized determinations. *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254. Where the Department has determined that a particular publication contains the banned content, the Prisoners bear a heavy burden to demonstrate that 103 CMR 481 was applied in an arbitrary and impermissible fashion. *See Thornburgh,* 490 U.S. at 416, 109 S.Ct. 1874 (noting that "we are comforted by the individualized nature of the determinations").

It appears from the Amended Complaint that the following publications received an individual review in which it was determined that the content of each of the following implicated the Department's stated goals:

> VIBE, The "Master Piece" postcards, GQ, Teen Vogue, Teen People, Elle, Interview, American Photo, Details, I and Eye, National Geographic: Faces of Africa, Diana and Nikon: Essays on Photography, National Enquirer (Thirty Years of Unforgettable Images), and Passages.

Each issue of these claimed publications was denied on an individual basis. *See* Am. Compl. ¶¶ 12–14. Although the Prisoners have made some argument that some of these publications fit within 103 CMR 481's exceptions, Pls' Mem. Opp. Sum. J., at 7, they have not demonstrated that the application of the regulations to these publications was wholly irrational. The Department looked at each of these items and made an individualized determination that they violated the valid institutional regulation. *See id.* This Court cannot step into the daily operations of the prison to determine whether every magazine or book sent to the Prisoners violates 103 CMR 481. *Shaw,* 532 U.S. 223, 230, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). Without a strong showing by the Prisoners that application of the rule to these particular publications is "without support in reason," *Carolene Prods. Co.,* 304 U.S. at 154, 58 S.Ct. 778, this court must defer to the Department's determinations. *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254.

There remain certain "personal pictures of girl friends posing nude" claimed by individual prisoners. Am. Compl. ¶ 12. Giving the words "personal pictures of girl friends posing nude" their ordinary meaning,[4] the Department's concerns—already upheld on their face—are here individually implicated, and the withholding of such pictures is constitutional.

### C. Qualified Immunity

As this Court holds that 103 CMR 481 is valid on its face and in its application, the Court need not address whether the defendants are entitled to qualified immunity.

### D. Boccio's State–Law Claims

Prisoner Nicholas Boccio filed an amended complaint to include additional

---

4. Although the specific photographs are not before the Court, it is generally known that the words "personal pictures of girl friends posing nude," Am. Compl. ¶ 12, ordinarily refer to materials that contain nude images.

state-law grounds for relief. This Court has supplemental subject matter jurisdiction over these claims based on the federal question upon which summary judgment has been granted. *See* 28 U.S.C. 1367(a). Therefore, there is no occasion further to consider these claims here. Boccio's claims are thus dismissed.

## IV. CONCLUSION

Although "[p]rison walls do not form a barrier separating their inhabitants from the protections of the Constitution," *Turner*, 482 U.S. at 82, 107 S.Ct. 2254, needs particular to the administration of prison facilities warrant deference to the determinations made by those charged with their operation. *Id.* at 84–85, 107 S.Ct. 2254. Therefore, prisoners mounting a constitutional challenge to prison regulations face a heavy burden in disproving their validity. *Id.* The Prisoners' have failed to make this showing with respect either to 103 CMR 481 on its face or its application. Accordingly, the defendants' motion for summary judgment is hereby GRANTED [Doc. No. 14]. The Prisoners' motion for summary judgment is DENIED [Doc. No. 17]. Judgment shall enter for the defendants.